1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

WARD B. T.,[1]

                  Plaintiff,

     v.

ANDREW M. SAUL,[2]
Commissioner of Social Security,

                  Defendant.

Case No.  ED CV 19-00123-RAO

**MEMORANDUM OPINION AND ORDER**

## I.    <u>INTRODUCTION</u>

       Plaintiff Ward Benjamin Tate ("Plaintiff") challenges the Commissioner's partial denial of his application for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons stated below, the decision of the Commissioner is REVERSED, and the matter is REMANDED.

///

---

[1]  Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2]  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul, the current Commissioner of Social Security, is hereby substituted as the defendant herein.

## II. PROCEEDINGS BELOW

On June 7, 2012, Plaintiff filed an application for a period of disability and DIB alleging disability beginning on December 30, 2004. (Administrative Record ("AR") 69-70, 80-81.) The same day, Plaintiff also protectively filed an application for SSI under Title XVI alleging disability beginning on December 30, 2004. (AR 201-03, 204-15.) His application for a period of disability and DIB was denied on December 11, 2012. (AR 160.) Plaintiff filed a written request for hearing, and a hearing was held on June 16, 2014. (AR 48-77, 176-77.) Represented by counsel, Plaintiff appeared and testified, along with his wife, and an impartial vocational expert. (AR 48-77.) On September 9, 2014, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act, from December 30, 2004 through the date of decision. (AR 26.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (AR 5.)

Plaintiff filed his first action in this Court on April 28, 2016. (AR 441-42, 445-47.) The action resulted in reversal and remand of the ALJ's decision. (AR 453, 454-59.) On remand, the Court instructed the ALJ to "reassess Plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the record, for discounting or rejecting any testimony." (AR 458.)

On September 19, 2017, the Appeals Council notified Plaintiff of the remand. (AR 460-62.) Plaintiff appeared and testified at a hearing on May 7, 2018, and at a supplemental hearing on September 4, 2018. (AR 375- 423.) The supplemental hearing included testimony from David M. Glassmire, Ph.D., an impartial psychological expert, and David A. Rinehart, an impartial vocational expert. (AR 401-423.) Plaintiff was represented at both hearings. (AR 375-377, 401-403.)

On October 16, 2018, the ALJ rendered a partially favorable decision, finding Plaintiff disabled only as of January 1, 2013. (AR 348.) Plaintiff did not file an appeal

2

with the Appeals Council. (Joint Stipulation "JS" 3.) The ALJ's decision became the Commissioner's final decision.[3] Plaintiff filed this action on January 22, 2019. (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act. *See Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 30, 2004, the alleged onset date ("AOD"). (AR 351.) At **step two**, the ALJ found that Plaintiff has the following severe impairments since the AOD: unspecified mood disorder and unspecified anxiety disorder, hypertension, peripheral neuropathy, and back strain or sprain. (*Id.*) In addition, the ALJ found that beginning January 1, 2013, Plaintiff has had the following severe impairments: major depressive disorder, general anxiety disorder, neurocognitive disorder from depression and medications, hypertension, peripheral neuropathy, and back strain or sprain. (*Id.*) At step three, the ALJ found that prior to January 1, 2013, Plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*)

Before proceeding to step four, the ALJ found that prior to January 1, 2013, Plaintiff had the residual functional capacity ("RFC") to "perform medium work . . . with the following additional restrictions: non-complex, routine tasks; no interactions with the public; occasional teamwork with coworkers and supervisors; and would miss work one to two time[s] per month." (AR 353.)

///

---

[3] "[W]hen a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case." 20 C.F.R. § 404.984 (a). Upon review of the record, the Court finds that the Appeals Council did not assume jurisdiction over the case and as such the ALJ's decision is the Commissioner's final decision subject to this Court's review.

At **step four**, the ALJ found that Plaintiff has been unable to perform his past work since December 30, 2004. (AR 357.) At **step five**, the ALJ found that "[p]rior to January 1, 2013, . . .there were jobs that exist[ed] in significant numbers in the national economy that [Plaintiff] could have performed." (AR 358.) Accordingly, the ALJ determined that, as to Plaintiff's claim for period of disability and DIB, Plaintiff had not been under a disability from the AOD through December 31, 2007, the date last insured. (AR 362.) As to Plaintiff's claim for SSI, the ALJ found that Plaintiff was not disabled prior to January 1, 2013. (*Id.*)

## III. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. A court must affirm an ALJ's findings of fact if they are supported by substantial evidence and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins*, 466 F.3d at 882 ("If the

4

1  evidence can support either affirming or reversing the ALJ's conclusion, we may not
2  substitute our judgment for that of the ALJ."). The Court may review only "the
3  reasons provided by the ALJ in the disability determination and may not affirm the
4  ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th
5  Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

6  **IV.   DISCUSSION**

7  Plaintiff raises one issue for review: whether the ALJ properly considered
8  Plaintiff's subjective symptoms in assessing the RFC. (*See* Joint Submission ("JS")
9  5.) For the reasons below, the Court agrees with Plaintiff.

10  **A.    The ALJ Failed to Properly Assess Plaintiff's Subjective Symptom**
11  **Testimony**

12  Plaintiff argues that the ALJ improperly rejected Plaintiff's subjective
13  symptom testimony. (*See* JS 5-14, 23-24.) The Commissioner disagrees. (*See* JS
14  14-23.)

15  **1.    Plaintiff's June 16, 2014 Testimony**

16  Plaintiff testified that he completed a total of two years of college. (AR 42.)
17  He was 56 years old at the time of the hearing. (*Id.*) He testified that he is six feet,
18  two inches tall and weighs about 240 pounds. (AR 43.)

19  As to his work history, Plaintiff testified that the last time he worked was in
20  2002. (AR 39. ) He worked, and was a partner, for a company called Major Cleanup
21  Inc. (*Id.*) Major Cleanup Inc. was a hazardous waste transporting service. (AR 61.)
22  Plaintiff owned, operated, ran, and trained employees. (*Id.*) Plaintiff reports that he
23  would get mad and irritated by the employees and his business partner. (AR 39-40.)
24  Plaintiff testified that one day he "completely lost it" and "tore up the office." (AR
25  40.) He explained that in 2002, he accused his business partner of embezzling money
26  but that he does not think that his partner embezzled money and it was all in his mind.
27  (AR 41.) Plaintiff had previously worked for Budget Environmental Services in 1999
28  and made about $50,000 that year. (AR 39.)

Plaintiff then testified that he purchased an antique shop in 2007. (AR 41.) In 2008 or 2009, Plaintiff filed for bankruptcy. (*See* AR 40-41.) He explained that "half" of the problem is that he has great ideas but that he is unable to follow through with them. (*Id.*) Plaintiff testified that he moved several times in the last years as a result of "ideas of doing great things." (AR 49.) However, he explained that "when it came down to it, [he] couldn't do it." (*Id.*) Looking back on his decisions, Plaintiff testified that the ideas were "losing proposition[s]" and that those decisions put his wife "through hell." (*Id.*) For example, the antique shop was his idea and while he intended to be there, he got worse and could not go to work. (AR 50.) He would leave his wife at the antique shop alone for seven days a week and twelve-hour days. (*Id.*) Plaintiff reported being unable to work and being stuck at home. (*Id.*)

In 2009, Plaintiff went to a clinic where a psychiatrist told him "what was wrong throughout" at least the last 10 years. (AR 41-42.) Plaintiff explained that it was "awfully hard" to get an appointment. (AR 42.) Plaintiff testified that the psychiatrist told him to avoid stress. (AR 50.) Plaintiff reported that when he filed for bankruptcy, the problem got worse. (*Id.*)

The last time Plaintiff sought treatment from a mental health provider was in 2013. (AR 38.) Plaintiff was receiving counseling and medication. (*Id.*) Plaintiff testified that he had not sought treatment since then because he could not afford treatment. (*Id.*) He did not have insurance and only recently obtained Medi-Cal. (AR 38-39.)

As to physical ailments, Plaintiff testified that in the 1980s he was informed that he does not have cartilage between his knees. (AR 44.) As a result, Plaintiff was told not to stoop or bend because it would cause him pain. (AR 44-45.) Plaintiff was not ordered to wear knee braces. (*Id.*) Plaintiff also explained that in the 1970s he was diagnosed with mitral valve prolapse and took blood pressure medicine to help his heart. (AR 44.)

///

Plaintiff has a driver's license but does not drive unless he absolutely has to. (AR 45.) He testified that he has problems leaving the house. (*Id.*) He gets panic attacks that worsen when he drives. (*Id.*) He used to love driving but now he cannot drive without getting the sweats. (*Id.*) He explained that his hands get clammy. (*Id.*) Plaintiff does not go out of the house and cannot really drive. (*Id.*) Plaintiff explained that he does not trust himself anymore. (*Id.*)

As far as daily activities, Plaintiff testified that he does "[v]ery little to nothing." (AR 45.) Plaintiff noted that he used to be more social and had hobbies but that now he has no interests. (*Id.*) He does not have a social life. (AR 47.) He is "completely shut off from the world these days." (AR 48-49.) He described this as "the worst time in [his] life" because he feels worthless and cannot do the things he used to do. (AR 49.)

Plaintiff did not shave for the hearing because he cut himself once. (AR 45.) Plaintiff explained that he was "extreme[ly] nervous" to be at the hearing. (AR 45-46.) Plaintiff does not help with chores. (AR 46.) He described himself as a "zombie," he "might get three hours [of] sleep," and sits on the couch. (*Id.*) Plaintiff sometimes does not sleep. (AR 48.) In the past he has gone two to three days without sleeping and did not sleep the night before the hearing. (*Id.*)

Plaintiff explained feeling worthless and depressed. (AR 46.) He feels that he should do something but cannot. (*Id.*) He also testified to having anger issues and that is what happened at work. (AR 47.) He noted that it had happened before, but that he was getting worse. (*Id.*) He sometimes feels "as happy as a bee" but he is unable to leave the house. (*Id.*) Plaintiff explained that he gets ideas of all the things he wants to do but when he does not do those things, he ends up getting angry at himself, his wife, and anyone around him. (*Id.*)

Plaintiff testified that he cannot concentrate. (AR 47.) He cannot concentrate even when he watches television, and after a while he will forget what he was watching. (*Id.*) When he watches a movie, by the middle of the movie he no longer

remembers the beginning. (*Id.*) If his wife asks him to do something at their house, Plaintiff will usually forget unless his wife reminds him. (*Id.*) He states that he lacks motivation and gets "panicky." (*Id.*) He feels that he cannot do simple tasks anymore. (*Id.*) He reports being unable to keep track of bill due dates and he cannot keep track of his bank account. (AR 50.) Plaintiff does not know how much money is in the account. (*Id.*) Plaintiff states that if it was not for his wife, he would not be here. (AR 51.)

Plaintiff explained that if someone is aggressive or gives him instructions, he will usually get mad. (AR 47-48.) He thinks that he would have trouble at work because instead of following the instruction he would get mad, his blood pressure would rise, he would feel like he was having a panic attack, he would get sweaty, and might shake. (AR 48.)

## 2.     Plaintiff's May 7, 2018 Testimony

After the case was remanded, Plaintiff testified at a hearing in front of a another ALJ. (AR 375-400.) At the hearing, Plaintiff discussed his mental health. (*See id.*) Plaintiff again testified that he last worked in 2002 and owned an antique shop in 2008, which was run by his wife. (AR 382.) Plaintiff explained that he was mostly at home due to his condition. (*Id.*) Plaintiff reported what the ALJ described as a "fearful anxiety." (*Id.*) The fearfulness kept him in the house. (*Id.*)

Plaintiff reported that he drove to the hearing. (AR 382.) He was accompanied by his wife, but she did not drive because she does not drive on the freeway. (AR 383.)

Plaintiff explained that he stopped working because he felt fearful and his mood would go up and down. (*Id.*) He could not function and had mood swings. (AR 384.) He reports being unable to concentrate. (*Id.*) Plaintiff stated that everything became "harder and harder" for him to do. (*Id.*) He also notes that he could not remember. (*Id.*) Plaintiff has not applied for work. (*Id.*)

*///*

Plaintiff reports that he started seeing a psychiatrist after the last hearing. (AR 384-85.) He also notes that he was seeing a psychiatrist or psychologist when he stopped working. (AR 385.) He denies having problems with drugs or alcohol. (*Id.*) Plaintiff testified that he did not know what was making him nervous when he stopped working. (AR 386.) However, he did explain that he could not take the pressure of dealing with people and that he was not like himself. (*Id.*) Plaintiff denies any significant physical ailments, noting that while his back would hurt, he would simply take aspirin. (*Id.*)

Plaintiff testified that he was unable to recover some medical records because they are "so far back." (AR 387.) He reports having gone to acupuncturists for his anxiety. (*Id.*) He stated that it did help him calm down and that he still gets acupuncture. (*Id.*) When Plaintiff stopped working, he was not seeing a psychiatrist or psychologist but did visit a doctor who prescribed medicine for his nerves. (*Id.*)

He reports feeling worse now than when he stopped working. (AR 388.) Plaintiff does not go out of the house often. (*Id.*) He stopped going out of the house on and off since 2002, but completely stopped leaving the house in 2009. (*Id.*)

Plaintiff does not believe that in 2009 he could have taken a job that did not require dealing with people because he does not believe that he could have done anything. (AR 388.) He testified that it was not only having to deal with people or the inability to concentrate that gave him cold sweats. (AR 388-89.) He does not know what set him off and found it difficult to describe. (AR 389.) Plaintiff states that he thought a psychiatrist was helping him. (*Id.*)

When Plaintiff is at home, he explains that he is not active, instead he listens to music. (AR 389.) He notes that he gets irritated and frustrated by everything, including the news. (AR 389-90.) He explains that since 2002 he gets frustrated easily. (AR 390.) He believes that he it all started going downhill in 2002. (*Id.*) Plaintiff states that the doctors just "throw pills at him." (*Id.*) Plaintiff also reports that his problem with insomnia started in 2002 or 2003, and it has gradually gotten

9

worse. (*Id.*) He takes pills to sleep but still does not sleep well. (*Id.*) His mind never stops working and he is constantly thinking about something. (*Id.*) Plaintiff testified that he first sought help in 2002 or 2003 and saw a psychiatrist. (AR 392.)

Plaintiff reported that with all the medication he is taking he does not know how to function. (AR 392.) He does not believe that the medication is helping him. (AR 393.) He still suffers from anxiety and insomnia. (AR 393-94.) He does not go out without his wife or brother-in-law. (AR 394.) His brother-in-law drives him most of the time. (*Id.*)

As far as his mood swings, Plaintiff explained that his "ups" consisted of him being happy, the feeling of being up in the morning and working and feeling good about himself. (AR 394.) He described "downs" as not being able to do anything, being depressed, unable to concentrate, and getting cold sweats. (*Id.*) Plaintiff testified that he had more downs than ups. (AR 394-95.) Plaintiff then testified as to his physical ailments. (AR 395-98.)

### 3.    Plaintiff's September 4, 2018 Testimony

At a supplemental hearing, Plaintiff testified that he was receiving treatment between 2004 and 2005. (AR 411.) However, Plaintiff was unable to obtain those records. (AR 412.) Plaintiff is under the impression that one of the doctors died and he was unable to find any records. (*Id.*) Plaintiff explained that at the time he was having "terrible emotional problems." (*Id.*) This in part was due to finding out that his business partner had embezzled money from him. (*Id.*) When he found out, Plaintiff reports that he "went off the rails," "blew up," and "tore up the place." (*Id.*) Plaintiff also testified that during that time he could not sleep or eat and just felt terrible. (AR 413.) He also reports being unable to work. (*Id.*) Plaintiff admits that his mood swings began before the problems with his business partner. (AR 418.) However, he does note that his mood swings worsened after his partner "betrayed him." (*Id.*)

///

In 2008, there was an indication that Plaintiff suffered from bipolar disorder. (AR 413.) Plaintiff explained that he had a difficult childhood that included needing a speech therapist, a father that was dependent on alcohol and committed domestic abuse. (*Id.*) He describes 2002 as terrible and notes that he felt hopeless. (AR 414.) He has felt hopeless since then. (*Id.*)

Plaintiff again discussed the antique store he purchased. (AR 414.) For three months Plaintiff ran the store, including doing the book work, but then his wife had to run it herself. (AR 414-15.) The store eventually went bankrupt. (AR 415.) While the idea to open the business was not "off the cuff," Plaintiff explains that if he had looked into it more, he would not have done it. (*Id.*) While he was running the store, he was having problems talking to people. (*Id.*) He was suffering from extreme anxiety and it got worse. (AR 415-16.) He would dread going to work and a lot of days he would not go to work. (AR 416.)

Plaintiff would feel depressed and anxious around people. (AR 417.) Plaintiff cannot describe what stopped him from getting out of bed in the mornings. (*Id.*) He reports that the psychiatrists just throw pills at him and tell him to feel better, but he does not. (AR 417.) Plaintiff believes that he has been fighting depression since elementary school. (*Id.*) He describes himself as reserved and notes that he was never the person that was outgoing. (*Id.*) He started working when he was 16 and was proud of himself for being a good worker. (*Id.*) Plaintiff notes that he feels the opposite now. (*Id.*)

### 4.    Monica Tate's June 16, 2014 Testimony

Monica Tate ("Mrs. Tate") testified she has been married to Plaintiff for 25 years. (AR 52.) During that time Plaintiff and Mrs. Tate have always lived together. (*Id.*) Except for the time that Mrs. Tate is at work, she is with Plaintiff most of the day. (*Id.*) Mrs. Tate begins work at 9:00 a.m. and returns home at 5:30 p.m. or 6:00 p.m. (*Id.*) While she is at work, Plaintiff calls Mrs. Tate about four times a day. (*Id.*) Usually, Plaintiff asks Mrs. Tate what she is doing and what time is she going to

return home. (*Id.*) Plaintiff will also text Mrs. Tate. (AR 52-53.) If Mrs. Tate does not answer the phone or does not respond to Plaintiff's texts, he gets angry and yells at her. (AR 54-55.) Mrs. Tate testified that if she does not answer the phone Plaintiff does not feel good and is anxious. (AR 55.) She reported that sometimes she does not want to go home. (*Id.*) She notes that things have "gotten really bad" and that it is a bad situation. (*Id.*)

Mrs. Tate testified that Plaintiff is a recluse but that on the occasions that he does go out, she does not want to be in the car with him. (AR 55.) Mrs. Tate describes that Plaintiff "gets out of control and angry as soon as somebody cuts him off." (*Id.*) She also noted that Plaintiff does not like anybody, everybody makes him upset, and he hates everything. (*Id.*) She notes that Plaintiff does not like his family anymore and will fight with family. (*Id.*) She will usually go by herself to family reunions while Plaintiff stays home. (*Id.*)

Mrs. Tate reported that there are simple things that she wishes Plaintiff would help her with. (AR 56.) When Mrs. Tate forgets to give her dog water, Plaintiff does not do it for her. (*Id.*) If Mrs. Tate asks Plaintiff to do something like take out the frozen chicken, Plaintiff does not do it. (*Id.*) Mrs. Tate wishes Plaintiff would look for a job and be like he used to be. (*Id.*)

Mrs. Tate explained that Plaintiff has been trying to buy businesses for years and that they have lost a lot of money as a result. (AR 56.) She noted the purchase of a print shop in Seattle that resulted in her having to run the store. (*Id.*) She states that even though she could not do it by herself and someone was taking money from her, Plaintiff bought the antique store. (*Id.*) The money that Plaintiff and Mrs. Tate had went towards buying the antique store. (*Id.*) They thought Plaintiff would "be able to do it," but soon after Plaintiff left her alone to run the store. (*Id.*) Plaintiff would not help Mrs. Tate. (AR 56-57.) The landlord took over the store because she was unable to pay the rent. (AR 57.) She testified that Plaintiff has had a pattern of losing businesses. (AR 57.) With the previous business, Plaintiff's business partner

could not take Plaintiff's anger anymore. (*Id.*) Plaintiff would lose his temper and throw the phone and other items. (*Id.*)

Mrs. Tate does not believe that Plaintiff can get up to work or clean himself up to look decent enough for someone to hire him. (AR 57-58.) Plaintiff is sitting on the couch when she leaves for work and in bed when Mrs. Tate arrives from work. (AR 57.) She does not believe Plaintiff could complete "minimal tasks." (AR 58.)

Lastly, Mrs. Tate testified that Plaintiff once visited the emergency room after he got angry and slammed his hand on the door. (AR 58.) Plaintiff almost broke his fingers. (*Id.*) He has not sought emergency mental health treatment. (*Id.*) Plaintiff has hit the wall and thrown a phone at Mrs. Tate. (AR 59.) Mrs. Tate testified that Plaintiff has been working since he was 16. (*Id.*) Once they got married, Mrs. Tate became aware of Plaintiff's anger issues. (*Id.*)

### 5. Plaintiff's Function Report

The administrative record also contains an undated function report completed by Plaintiff. (AR 233-240.) In the report, Plaintiff states that he lives in a house with family. (AR 233.) Regarding his illnesses, Plaintiff states that most days he is unable to leave the house. (*Id.*) He describes feeling afraid. (*Id.*) Plaintiff is unable to sleep and cannot stop thinking. (*Id.*) He feels very depressed and cannot do anything. (*Id.*) His heart races and he is unable to catch his breathe. (*Id.*) He suffers from mood swings and goes from being mad to being very happy. (*Id.*) The medication he takes makes his mind unclear. (*Id.*)

Plaintiff spends his days trying to watch television or listening to the radio. (AR 234.) He does not have any interests and spends most of his day in the house. (*Id.*) He falls asleep during the day. (*Id.*) Plaintiff's wife cooks for him and takes care of their dog. (*Id.*) Plaintiff does not take care of anyone or any pets. (*Id.*) Before his illnesses, Plaintiff "lived a happy, normal life, worked, and had hobbies," but now he does not. (*Id.*)

///

13

As far as his personal care, Plaintiff's wife washes his clothes and lays out his clothing. (AR 234.) Plaintiff shaves once a week. (*Id.*) He bathes when his wife is home. (*Id.*) Plaintiff reports that he can groom his hair, feed himself, and use the toilet. (*Id.*) He does need his wife to remind him to take care of his personal needs and help him when he needs help. (AR 235.) Plaintiff also needs his wife to remind him to take his medicine. (*Id.*)

Plaintiff does not prepare his own meals. (AR 235.) Prior to his illness, he used to be able to cook. (*Id.*) Now, he is "not trusted" to prepare meals. (*Id.*) Plaintiff does not help with household chores because he feels unstable and unsafe. (AR 235-36.) He goes outside once or twice a week. (AR 236.) He notes that he is afraid to go outside. (*Id.*) When he does go out, Plaintiff walks or rides in a car. (*Id.*) He does not go out alone or drive because he is afraid. (*Id.*) Plaintiff does not go shopping. (*Id.*) Plaintiff is unable to pay bills, count change, handle a bank account, and handle a checkbook. (*Id.*) Plaintiff's wife handles their finances. (*Id.*) Before his illness, Plaintiff was able to handle money and was "normal." (AR 237.)

Plaintiff lists his only hobby as watching television. (AR 237.) However, he is unable to watch television for a long time because his mind begins to wander. (*Id.*) He explains that before his illness he "did all things." (*Id.*) Plaintiff talks with his wife every day and with his sister twice a month. (*Id.*) Plaintiff needs to be reminded to go to the doctor and to go shopping with his wife. (*Id,*) He needs someone to go with him because he does not trust himself. (*Id.*) He has difficulty getting along with family due to his mood swings. (AR 238.) He notes that after his illness everything went from great to bad. (*Id.*)

Plaintiff's illness affects his ability to lift, squat, bend, stand, walk, kneel, see, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (AR 238.) He can pay attention for 20 minutes. (*Id.*) He does not finish what he starts. (*Id.*) He cannot follow written instructions but is able to follow spoken instructions. (*Id.*) When dealing with authority figures, Plaintiff

usually gets mad. (AR 239.) He has never been fired due to problems getting along with people. (*Id.*) He cannot handle stress. (*Id.*) He does not handle changes to routine very well. (*Id.*) He has a fear of getting out of the house, gets mad and depressed. (*Id.*) Plaintiff wears reading glasses. (*Id.*) Plaintiff takes medication but the medication causes dizziness, heat palpitations, anger, fear, and issues with sleep. (AR 240.)

Plaintiff concludes by explaining that prior to his illness he was a well-rounded person with friends. (AR 240.) He began working at 16 years-old and was a hard worker. (*Id,*) He has been married for 24 years and notes that if it was not for his wife, he would be not be alive. (*Id.*)

### 6. Third-Party Function Report

On September 30, 2012, Mrs. Tate, Plaintiff's wife, prepared a function report describing Plaintiff's illnesses and conditions. (AR 224-232.) Mrs. Tate has known Plaintiff for the past 24 years. (AR 224.) Plaintiff lives in a house with family. (*Id.*)

Mrs. Tate explains that due to his condition, Plaintiff's ability to work is limited because he is unable to sleep, and because he takes strong medicine and has mood swings. (*Id.*) She notes that Plaintiff has been tremendously affected. (*Id.*) She describes Plaintiff as being unable to get out of bed most days, but when he does get up, he lays on a couch. (AR 225.) Plaintiff does not help with anything around the house. (*Id.*) He rarely goes out of the house. (*Id.*) Plaintiff grinds his teeth and has to wear a mouth guard. (*Id.*) Plaintiff is not responsible for taking care of anyone or taking care of pets. (*Id.*) Mrs. Tate is responsible for everything in the house, including taking care of their dog. (*Id.*) She notes that before Plaintiff's illness, Plaintiff used to do "pretty much anything." (*Id.*) Now, Plaintiff sleeps for a couple of hours and then goes to sit on the couch. (*Id.*)

As far as his personal care, Mrs. Tate lays out Plaintiff's clothes, cooks for Plaintiff, and she forces him to trim his beard. (AR 225.) Plaintiff bathes when Mrs. Tate is home. (*Id.*) He can care for his hair and use the toilet by himself. (*Id.*) He

needs to be reminded to change his clothes more often, trim his beard, and to take his medicine. (AR 226.) Mrs. Tate notes that Plaintiff does not cook and does not do any household chores. (*Id.*) Plaintiff does not show any interest in doing housework, is depressed, and cannot do it. (AR 227.)

Mrs. Tate reports that Plaintiff goes out once a week. (AR 227.) Plaintiff tells Mrs. Tate that he is afraid to go out and he feels sleepy. (*Id.*) When he does go out, he walks or rides in a car. (*Id.*) He does not go out alone because he feels he may have a panic attack and does not feel comfortable. (*Id.*) Plaintiff does not drive because he is on too much medicine and does not get enough sleep. (*Id.*) He does not do any shopping. (*Id.*) Mrs. Tate explains that Plaintiff used to be able to handle money but since his illness he is not able to pay bills, count change, handle a savings account, or use a checkbook because he makes too many mistakes. (AR 227-28.) Mrs. Tate notes that Plaintiff's only hobby or interest is watching television "for a while." (AR 228.) However, he is unable to concentrate on the program that he watches. (*Id.*) She reports that prior to his condition, Plaintiff was normal. (*Id.*)

As far as social activities, Mrs. Tate reports that Plaintiff talks on the phone with people but that he does not do this often. (AR 228.) He needs to be reminded to go to the doctor and to go grocery shopping with Mrs. Tate. (*Id.*) Plaintiff has difficulty getting along with family and friends because he does not feel like dealing with people for the most part. (AR 229.) Since his condition, Mrs. Tate states that she noticed big changes, in that, Plaintiff does not want to meet anybody and prefers to stay "in his cubicle" at home. (*Id.*)

Mrs. Tate explains that Plaintiff's illness affects his ability to lift, squat, bend, stand, walk, kneel, see, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (AR 229.) For physical limitations she notes that the problem is "bad knees" and problems with his feet are due to "extreme pain," while the remaining issues are "mental." (*Id.*) She notes that due to pain, Plaintiff is unable to walk far and will rest before continuing, depending

on how bad the pain is. (*Id.*) She thinks Plaintiff can pay attention for 10 minutes and he does not finish what he starts. (*Id*.) Plaintiff does not follow written instructions well and is "pretty good" with spoken instructions but does forget. (*Id.*)

Plaintiff gets upset with authority figures but has never been laid off for not being able to get along with people. (AR 230.) He does not handle stress well, and instead gets restless and mad. (*Id.*) Plaintiff is afraid of leaving the house, afraid of meeting people, and does not want to do anything. (*Id.*) He uses glasses and a mouthguard. (*Id.*) Mrs. Tate notes that all of Plaintiff's medicine has side effects. (AR 231.) She explains that Plaintiff has changed a lot since he got sick. (*Id.*) As a result, she feels a lot of pressure and feels sad and helpless. (*Id.*)

### 7.    **Applicable Legal Standards**

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony regarding the severity of his symptoms. *Id*. The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 8.    **Discussion**

"After careful consideration of the evidence," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the

alleged symptoms," but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of the symptoms are not fully supported prior to January 1, 2013." (AR 354.) The ALJ found that Plaintiff's symptoms and limitations were "not entirely consistent with the objective evidence as to the period prior to January 1, 2013" and that there was "no reliable medical source statement from any physician endorsing the extent of [Plaintiff's] alleged functional limitations." (*See* AR 22-24.) No malingering allegation was made, and therefore, the ALJ's reasons must be clear and convincing.

Plaintiff argues that the ALJ failed to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's testimony. (JS 8-14, 23-24.) Specifically, Plaintiff posits that the ALJ relied exclusively on the medical record when assessing Plaintiff's subjective symptom testimony and that the ALJ's reliance was reversible error. (*See* JS 23.) In support, Plaintiff cites to applicable law which correctly states that the ALJ may not rely solely on the lack of supporting objective medical evidence. (*See* JS 10-12, 23-24.)

The Commissioner argues that the ALJ properly discounted Plaintiff's subjective symptom testimony due to a lack of supporting objective medical evidence, lack of a medical source statement, a showing by medical opinions that Plaintiff could function at a higher level than Plaintiff reported, Plaintiff's course of treatment, and inconsistent statements "between Plaintiff's allegations and the record." (JS 16-22.) For example, the Commissioner argues that the ALJ considered Plaintiff's course of treatment in discounting his subjective symptom testimony. (JS. 21-22.) While, the ALJ described Plaintiff's mental health treatment, which included visits with a psychiatrist and acupuncturists, as well as medication, the ALJ did not rely on Plaintiff's course of treatment in discounting Plaintiff's testimony. (AR 354; *see* AR 353-57.) Similarly, the Commissioner argues that the ALJ noted inconsistencies between Plaintiff's complaints and the record. (JS 22.) The ALJ notes that Plaintiff's claim that he is unable to work due to his hypertension is

inconsistent with the medical record which shows some high blood pressure but no end-stage organ disease. (AR 357.) This would support the ALJ's discounting of Plaintiff's subjective testimony due to the lack of supporting objective medical evidence but does not constitute a separate and distinct reason.

This Court may only "review the reasons the ALJ asserts." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L.Ed. 1995 (1947); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001)). The ALJ gave only two reasons for discounting Plaintiff's subjective symptom testimony – lack of supporting objective medical evidence and lack of a medical source statement. (*See* AR 353-57.) The Commissioner's arguments that the ALJ discounted Plaintiff's subjective symptom testimony for reasons other than those laid out by the ALJ are not subject to this Court's review. The Court reviews only whether the ALJ's specific reasons for discounting Plaintiff's subjective symptom testimony were clear and convincing.

Here, the ALJ discredits Plaintiff's subjective symptom allegations because (1) "the symptoms and limitations are not entirely consistent to the objective evidence as to the period prior to January 1, 2013," and (2) "there is no reliable medical source statement from any physician endorsing the extent of the claimant's alleges functional limitations." (AR 354-55.) Upon review, the Court finds that the reasoning provided by the ALJ for discounting Plaintiff's testimony in fact consists of only one reason – the lack of supporting objective medical evidence. What the ALJ describes as a "reliable medical source statement" is simply a medical opinion. *See* 20 C.F.R. § 404.1527(a)(1) (defining "medical opinion" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions"). Because "[m]edical opinion evidence is merely an example of objective medical evidence," the lack of a reliable medical source statement cannot form a "specific

19

and distinct reason for rejecting Plaintiff's subjective symptom testimony." *Williams v. Berryhill*, No. CV 17-03624-JDE, 2018 WL 791144, at *4 (C.D. Cal. Feb. 8, 2018) (citing *Vigil v. Comm'r of Soc. Sec.*, No. 1:16-cv-01677-SAB, 2017 WL 4075581, at *8 (E.D. Cal. Sept. 14, 2017); *Petit v. Astrue*, No. EDCV 11-02001-JEM, 2012 WL 3965146, at *7 (C.D. Cal. Sept. 11, 2012)).  Furthermore, this District has routinely found, and discussed, the absence or presence of medical source statements as a part of the objective medical evidence.  *See Garcia v. Berryhill*, No. EDCV 17-01396-JEM, 2018 WL 5884540, at *4 (C.D. Cal. Nov. 6, 2018) (discussing lack of a medical source statement as part of objective medical evidence); *Lucas v. Berryhill*, No. 5:16-cv-02464–SHK, 2018 WL 2448472, at *10 (C.D. Cal. May 29, 2018) (weighing medical source statement as part of discussion of objective medical evidence); *King v. Colvin*, No. ED CV 14–533–AS, 2014 WL 5810366, at *7-8 (discussing the absence of a medical source statement as supporting a finding that claimant's statements were unsupported by objective medical evidence).  Thus, the Court finds that the ALJ discounted Plaintiff's subjective testimony on the sole basis of lack of supporting objective medical evidence.

While the lack of supporting objective medical evidence is a factor that the ALJ can use in assessing Plaintiff's subjective symptom testimony, it cannot form the sole basis for discounting testimony. *Burch*, 400 F.3d at 681; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).  Here, the ALJ provided no other reasoning for discounting Plaintiff's subjective symptom testimony.  Thus, the ALJ improperly discounted Plaintiff's subjective symptom testimony.

### 9.    Conclusion

In sum, the ALJ did not give clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's subjective symptom testimony.  Accordingly, remand is warranted on this issue.

*///*

## B.     Remand for Further Administrative Proceedings

Because further administrative review could remedy the ALJ's errors, remand for further administrative proceedings, rather than an award of benefits, is warranted here. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (remanding for an award of benefits is appropriate in rare circumstances). Before ordering remand for an award of benefits, three requirements must be met: (1) the Court must conclude that the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) the Court must conclude that the record has been fully developed and further administrative proceedings would serve no useful purpose; and (3) the Court must conclude that if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Id.* (citations omitted). Even if all three requirements are met, the Court retains flexibility to remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* (citation omitted).

Plaintiff argues that the ALJ's failure, for the second time, to properly assess Plaintiff's subjective symptom testimony warrants an order crediting Plaintiff's testimony as true and ordering the payment of benefits. (JS 13, 24-25.) Plaintiff notes that his claims have been pending for over seven years. (JS 13.) The Commissioner argues that the credit-as-true rule is inapplicable here and that remand would be appropriate because the record contains inconsistencies that require a judicial determination by the ALJ. (JS 27.)

Under the credit-as-true rule, when the ALJ fails to articulate sufficient reasons for refusing to credit Plaintiff's subjective symptom testimony, the Commissioner must accept the testimony as true if there are no outstanding issues to be resolved. *Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1398-1401 (9th Cir. 1988.) However, the Ninth Circuit has expanded the circumstances under which the credit-as-true rule can be applied to include situations in which there may be

outstanding issues to be resolved.  *See Vasquez v. Astrue*, 572 F.3d 586, 593-94 (9th Cir. 2009)  The "purpose of the credit-as-true rule is meant to discourage the ALJs from reaching a conclusion about a claimant's status first, and then attempting to justify it by ignoring any evidence in the record that suggests an opposite result." *Id.* at 594 (citing *Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989).)

In *Vasquez*, the Ninth Circuit found that based on the claimant's age and the severe delay in obtaining a resolution it was appropriate to apply the credit-as-true rule.  *Id.* at 593-94.  There the claimant was 58 years old and her claim had been pending for approximately 7 years.  *Id.*; *see also Hammock*, 879 F.2d at 500, 503 (finding that due to claimant's age, 57 years old at the time of hearing, and the fact that her claim had been pending at least 8 years the ALJ must credit her testimony as true on remand); *Sanchez v. Berryhill*, No. EDCV 16-1774-FMO-MRW, 2018 WL 4694349, at *9 (C.D. Cal. July 19, 2018) (ordering the ALJ to credit as true where claimant was 52 years old and his claim was pending for 6 years).  Here, remand for further administrative proceedings is appropriate and consistent with *Vasquez* and *Hammock*.  Plaintiff is 61 years old and he filed his initial application in June 2012, more than seven years ago.  (*See* AR 69-70, 80-81.)

The Court finds that the ALJ failed to provide clear and convincing reasons supported by substantial evidence to discount Plaintiff's subjective testimony.  On remand, the ALJ shall "credit-as-true" Plaintiff's subjective allegations.  The ALJ shall then reassess Plaintiff's RFC and proceed through step four and step five, if necessary, to determine what work, if any, Plaintiff was capable of performing during the relevant time period.

///

///

///

///

///

**V.      CONCLUSION**

IT IS ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits and REMANDING the matter for further proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED:  November 25, 2019

*Rozella A. Oliver*

_____

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**